The DECORATIVE CENTER OF
HOUSTON, L.P., Plaintiff,

v.

DIRECT RESPONSE PUBLICATIONS,
INC., Defendant.

No. Civ.A. H–01–4069.

United States District Court,
S.D. Texas,
Houston Division.

June 13, 2002.

Robert O'Conor, Jr., Attorney at Law, Houston, TX, Donald A. Harwood, Itkowitz & Harwood, Jay B. Itkowitz, Itkowitz & Harwood, New York City, for plaintiff.

Donald B. McFall, McFall Sherwood, Houston, TX, for defendant.

## MEMORANDUM AND ORDER

ATLAS, District Judge.

Several motions are pending before the Court in this commercial dispute case. Defendant Direct Response Publications, Inc. ("Direct" or "Defendant") has moved to dismiss the claims filed against it [Doc. # 22] ("Motion to Dismiss").[1] Plaintiff The Decorative Center of Houston, L.P. ("DCH") responded,[2] and Direct replied.[3] DCH has moved for leave to amend the Complaint ("Motion to Amend")[4] and to extend the time to designate its expert witnesses ("Motion for Time"), and Direct has responded to each.[5] After reviewing

---

1. Direct also submitted the Brief of Defendant Direct Response Publications, Inc. in Support of its Motion to Dismiss Plaintiff's Claims [Doc. # 23] ("Direct's Brief").

2. *See* Brief of Plaintiff The Decorative Center of Houston, L.P. in Opposition to the Motion to Dismiss [Doc. # 28] ("DCH's Response").

3. *See* Response of Defendant Direct Response Publications, Inc. in Opposition to the Cross–Motion of Plaintiff to File an Amended Complaint and Reply to Plaintiffs Brief in Opposi-

tion to Defendant's Motion to Dismiss [Doc. # 30] ("Direct's Reply").

4. *See* Cross–Motion of Plaintiff The Decorative Center of Houston, L.P. to File an Amended Complaint [Doc. # 26]. DCH also submitted the Proposed Amended Complaint [Doc. # 27] ("Amended Complaint"). Direct opposes DCH's Motion for Leave to Amend. *See* Direct's Reply.

5. *See* Motion of Plaintiff the Decorative Center of Houston, L.P. to Extend Time to Designate Expert Witnesses [Doc. # 25]. Direct

the parties' submissions, the record, and the applicable authorities, the Court determines that DCH's Motion for Leave to Amend and Motion for Extension of Time will be **granted** and Direct's Motion to Dismiss will be **denied.** The Court also reiterates its prior order that the parties and their counsel participate in good faith in a mediation of their disputes on or before July 31, 2002, unless the case is settled without third party intervention before that date.

## I. *BACKGROUND FACTS*

This case arises out of the alleged false and misleading business practices of Defendant.[6] Plaintiff DCH is a Texas limited partnership that owns a building known as the Decorative Center (the "Building") in Houston, Texas, in which vendors in the interior decorating industry lease showrooms.[7] Direct is a Florida corporation with its principal place of business in Florida.

The facts as alleged by DCH[8] are as follows: In 1999, the parties agreed that Direct would publish four annual directories of the tenants in Building, one for each of the years 2000 through 2003. The directory was to be titled the *Decorative Center Houston* [year] *Directory* ("DCH Directory"). The parties' agreement is attached as Exhibit 1 to the Amended Complaint ("Publishing Agreement").

In 2001, the parties agreed that Direct would no longer publish the DCH Directory and executed the "Termination to Agreement" (Exhibit 2 to *Amended Complaint)* ("Termination Agreement"). Specifically, the Termination Agreement required DCH to pay $85,000 to Direct as consideration for Direct's agreement to:

not publish the Decorative Center Houston 2002 and Decorative Center Houston 2003 directories and/or [ ] not solicit tenants of the Decorative Center of Houston for advertising for the Decorative Center Houston 2002 and Decorative Center Houston 2003 directories.

Termination Agreement, ¶¶ 1–2. DCH paid the required $85,000 to Direct.

Following execution of the Termination Agreement, Direct allegedly solicited all of DCH's tenants to be listed in a publication called the *Dallas/Houston Design to the Trade* directory (the "Design Directory"). Direct offered to list for free the name, address, manager, owner, phone and fax, website and email address, area of specialty, and other information for each of DCH's tenants in the Design Directory. DCH attached to the Amended Complaint as Exhibit 3 a copy of the front side of the solicitation (the "Solicitation") that Direct faxed to DCH's tenants. The Solicitation bears the heading: "ATTENTION SHOWROOMS! 2002 Dallas/Houston Design To The Trade Survey ● Due: 6/22/2001, 5 p.m." The Solicitation clearly

responded, *see* Response of Defendant Direct Response Publications, Inc. in Opposition to the Motion of Plaintiff to Extend Time to Designate Expert Witnesses [Doc. # 29], DCH replied, *see* Reply to Defendant's Opposition to Extend Plaintiff's Time to Designate Expert Witnesses [Doc. # 31], and Direct submitted a sur-reply, *see* Sur–Reply of Defendant Direct Response Publications, Inc. Regarding Plaintiff's Motion to Extend Time to Designate Expert Witnesses [Doc. # 32]. DCH submitted the Plaintiff's Designation of Experts [Doc. # 33] on May 29, 2002.

6. The Court has federal question and diversity subject matter jurisdiction in this case. 28 U.S.C. §§ 1331 and 1332.

7. The vendors which lease space in the Building from DCH will be referred to as "tenants." DCH has 131 tenants.

8. Substantially the same factual allegations appear in both DCH's original Complaint [Doc. # 1] and in the Amended Complaint [Doc. # 27].

states that it is sent by "Direct Response Publications, Inc." and nowhere mentions or distinguishes this request from similar ones authorized in prior years by DCH for the DCH Directory.[9] The Solicitation does not state that Direct was no longer the publisher for the DCH Directory.

DCH alleges that the Solicitation, and other unspecified oral communications between Direct and DCH's tenants, misled the Building's tenants by inducing them to believe that they were being offered a renewal of their listing in the DCH Directory, and not a listing in a separate directory published solely by Direct. In other words, DCH's essential contention is that its tenants were misled into believing that the Design Directory was authorized in the same manner as the DCH Directory had been in the two preceding years. DCH contends that this occurred because Direct failed, in the Solicitation and in other communications, to inform the tenants that it no longer was the publisher of the DCH Directory. DCH further alleges that Direct obtained unfairly advertising revenues from its promotion of the Design Directory.

Direct subsequently published the Design Directory which includes a listing for each of the 131 Building tenants, some of which also purchased advertisements in the publication. Shortly thereafter, DCH apparently published its own *2002 DCH Building Directory* ("2002 DCH Directory").

DCH alleges that Direct's actions interfered with its business relations with the DCH tenants and reduced DCH's revenue from DCH tenants for paid advertising in the DCH Directory. In particular, DCH avers that only nineteen tenants placed advertisements in the 2002 DCH Directory, as compared to fifty-seven paid advertisements that appeared in the 2001 DCH Directory, which was published by Direct under the Publishing Agreement.

DCH filed this lawsuit on November 21, 2001. In the Complaint [Doc. # 1], DCH alleged causes of action under the Lanham Act, 15 U.S.C. § 1125(a)(1), and under state law theories of breach of contract, fraud, tortious interference with contract, and tortious interference with prospective business relations. Along with the Complaint, DCH filed a motion for a temporary restraining order [Doc. # 11] to enjoin Direct from publishing the Design Directory. Despite the Court's indication that it would promptly hear argument on DCH's motion for a temporary restraining order, DCH did not pursue its motion until January 9, 2002, when it filed a letter [Doc. # 9] seeking an emergency hearing. The Court held a telephone conference the same day, granted DCH's motion for a temporary restraining order, and set a preliminary injunction hearing for January 14, 2002. *See* Hearing Minutes and Order [Doc. # 12]. At the conclusion of the preliminary injunction hearing, the Court dissolved the temporary restraining order and denied DCH's motion for a preliminary injunction. *See* Hearing Minutes and Order [Doc. # 17]; Order Denying Motion for Preliminary Injunction and Vacating Temporary Restraining Order [Doc. # 20]. On January 14, 2002, the Court also issued a Docket Control Order [Doc. # 19] requiring DCH to amend its pleadings by March 11, 2002, and to designate its experts by April 30, 2002. The Docket Con-

---

9. The Solicitation contains the following statement:

Your showroom will be listed complimentary as a design resource in the upcoming ***Dallas/Houston Design To The Trade*** directory. Please update your information, list your product lines (if applicable) and circle all appropriate product categories on the reverse side[ ] and return to us by **6/22/2001** via fax or hand deliver to our advertising sales representative.

trol Order further provides that the discovery period ends on July 15, 2002, and sets the deadline to file dispositive motions for August 9, 2002.

Direct filed the Motion to Dismiss on April 4, 2002. On May 1, 2002, in response to Direct's motion, DCH filed the Motion to Amend and a proposed Amended Complaint. As in its original Complaint, DCH's Amended Complaint includes allegations for violation of the Lanham Act, breach of contract, and tortious interference with prospective business relations. In the Amended Complaint, however, DCH abandons its common law claims for fraud and tortious interference with contract, and adds the common law claim for unfair competition. The Court first decides whether DCH may amend its Complaint and then addresses Direct's Motion to Dismiss.

## II. *DCH'S MOTION TO AMEND*

### A. *Applicable Standards*

■ Rule 15(a) provides that leave to amend pleadings "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a); *Price v. Pinnacle Brands, Inc.,* 138 F.3d 602, 607–08 (5th Cir.1998). However, leave to amend is by no means automatic, and the decision to grant or deny leave to amend "is entrusted to the sound discretion of the district court." *Lyn–Lea Travel Corp. v. American Airlines, Inc.,* 283 F.3d 282, 286 (5th Cir.2002); *Parish v. Frazier,* 195 F.3d 761, 763 (5th Cir.1999); *Wimm v. Jack Eckerd Corp.,* 3 F.3d 137, 139 (5th Cir.1993); *Little v. Liquid Air Corp.,* 952 F.2d 841, 845–46 (5th Cir.1992), *aff'd en banc,* 37 F.3d 1069, 1073 n. 8 (5th Cir.1994). In deciding whether to grant leave to file an amended pleading, the district court "may consider such factors as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment." *Wimm,* 3 F.3d at 139 (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)) (leave to amend denied because of bad faith and dilatory motive). If the district court lacks a "substantial reason" to deny leave, its discretion is not broad enough to permit denial. *Lyn–Lea,* 283 F.3d at 286; *Lone Star Ladies Invest. Club v. Schlotzsky's Inc.,* 238 F.3d 363, 367 (5th Cir.2001) (denying leave to amend absent articulable reason is an abuse of discretion); *Wimm,* 3 F.3d at 139.

### B. *Analysis*

■ DCH argues that its Motion to Amend is its "first request to amend the pleadings [that] com[es] shortly after Defendant's Motion to Dismiss and without any undue delay, dilatory motive, bad faith, or prior attempts to cure alleged deficiencies in the pleading." DCH's Response, at 23. Further, DCH argues that its proposed amendments will not prejudice Direct because "it does not change the essential and underlying facts of the action" but "merely states an alternative legal theory for recovery on the same underlying facts." *Id.* at 23–24. DCH also contends that its Motion for Leave to Amend should be granted because "it comes at an early stage in the proceedings in which discovery has not been completed." *Id.* at 23. DCH lasts notes that Direct failed to timely file its Motion to Dismiss within the meaning of Federal Rule of Civil Procedure 12(b) because Direct submitted the motion after it filed its Answer to DCH's original Complaint.

In response, Direct argues that leave to amend should not be granted because DCH's behavior has been "dilatory." Direct's Reply, at 6. Direct notes that the time set by the Court for DCH to amend its pleadings, March 11, 2002, has passed.

The Court grants DCH's Motion to Amend. DCH's failure to seek leave to amend its complaint by the March 11, 2002 deadline is not, alone, sufficient to justify denial of DCH's Motion to Amend. Direct did not identify alleged deficiencies of the originally pleaded claims until recently in the Motion to Dismiss. Further, Direct suffers no unfair prejudice from the amendment because the proposed changes to the claims do not significantly alter the nature of this case. Finally, Direct has time under the original Docket Control Order's schedule to conduct discovery on any new issues raised in the Amended Complaint and further, in any event, adjustments to that schedule will be made as a result of other rulings in this Memorandum and Order.

The Court finds that it is in the interests of justice to allow DCH's amendment of its claims. The amendment enables the parties and Court to focus on the genuine issues in the case. Leave is granted for DCH to file its Amended Complaint.

The Court now turns to Direct's Motion to Dismiss.

## III. DIRECT'S MOTION TO DISMISS

### A. Applicable Standard

Direct has filed what is denominated a "motion to dismiss." The Court concludes that Direct's motion is properly considered pursuant to Rule 12(h)(2) and/or Rule 12(c).[10] The Fifth Circuit applies the same standard for a motion to dismiss under Rules 12(c) as it does for a motion to dismiss under 12(b)(6) of the Federal Rules of Civil Procedure. *E.g., Jones*, 188 F.3d at 324 (relying upon cases that provide the standard for a Rule 12(b)(6) motion in stating the applicable standard for a Rule 12(c) motion).

---

**10.** DCH argues that Direct's Motion to Dismiss is untimely and is procedurally barred. The Court rejects these arguments. DCH argues that, under Federal Rule of Civil Procedure 12(b), a motion to dismiss "shall be made before pleading if a further pleading is permitted." Essentially, DCH contends that Rule 12(b) requires Direct to make its motion to dismiss *before* serving its Answer to DCH's Complaint, and that inclusion of the defense in the Answer is insufficient to preserve the issue. The quoted provision conflicts with another provision in Rule 12, specifically in subdivision (h)(2), which provides that a "defense of failure to state a claim upon which relief can be granted ... may be made in any pleading permitted or ordered under Rule 7(a), *or by motion for judgment on the pleadings, or at the trial on the merits.*" Fed. R.Civ.P. 12(h)(2) (emphasis added). Rule 12(h)(2), the more specific provision, refers to motions to dismiss for failure to state a claim, which it permits at any time throughout the proceedings, up to and including trial. Courts generally have held that Rule 12(h)(2) allows a district court to convert a motion to dismiss under Rule 12(b) to one for judgment on the pleadings under Rule 12(c). *National Ass'n of Pharmaceutical Mfrs. v. Ayerst Labo-* *ratories*, 850 F.2d 904, 909–10 n. 2 (2d Cir. 1988). The Fifth Circuit follows this procedure. *See Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir.1999). The Court also rejects DCH's reliance on a district court case (*Joe Hand Promotions, Inc. v. Lott*, 971 F.Supp. 1058, 1063 (E.D.La.1997), *abrogated on other grounds by Prostar v. Massachi*, 239 F.3d 669, 678 (5th Cir.2001)) that did not even reach the issue DCH raises. The Court accordingly concludes that the motion is properly filed pursuant to Rule 12(h)(2) and/or Rule 12(c).

DCH also makes the frivolous argument that the "Motion to Dismiss is a 'dispositive motion' impermissibly filed in disregard of the Court's deadline for 'dispositive motions'" (*i.e.*, August 9, 2002). DCH's Response, at 7. The Court's deadline for dispositive motions establishes the *latest* date for such motions, but in no way precludes parties from filing motions earlier. In addition, DCH's argument concerning the need for discovery is irrelevant. Direct has made a motion to dismiss based solely on the pleadings. Thus discovery is immaterial. The Court will not convert this motion to one for summary judgment nor will it consider any evidence outside of the pleadings.

■ Generally, a motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted. *Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 365 (5th Cir.2000). A district court may not dismiss a complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Southern Christian Leadership Conf. v. Supreme Court of Louisiana*, 252 F.3d 781, 786 (5th Cir.2001). Thus, the Court must determine whether the complaint states any valid claim for relief in the light most favorable to the plaintiff and with every doubt resolved in the plaintiff's behalf. *Lowrey v. Texas A & M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir.1997). The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. *Zephyr Aviation, L.L.C. v. Dailey*, 247 F.3d 565, 573 (5th Cir.2001). However, the plaintiff must plead specific facts, not mere conclusory allegations or unwarranted deductions of fact, in order to avoid dismissal for failure to state a claim. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir.2000).

### B. *Lanham Act Claims*

In the Amended Complaint, DCH asserts claims for damages and for declaratory and injunctive relief under § 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a)(1),[11] DCH complains that Direct misled the tenants through two distinct sets of acts. First, Direct sent the Solicitation to all 131 tenants in the Building. The Solicitation requests that tenants "update" their information in Direct's "records." The Solicitation also states that "[o]ur records currently show the following information" (emphasis added) about the tenant and lists specific pertinent information about the tenant's staff, address, phone and fax numbers and showroom description. DCH contends that the Solicitation misled the tenants by failing to explain that Direct was no longer authorized to publish the 2002 DCH Directory. DCH contends that this omission caused some tenants to purchase advertisements in the Design Directory under the incorrect belief that they were purchasing advertisements in the DCH Directory.

In addition to complaining about the Solicitation, DCH makes unspecified, generalized allegations that Direct made false or misleading oral statements to some tenants, which caused some of them to place advertisements in the Design Directory thinking that they were advertising in the DCH Directory. Direct's principal arguments in favor of dismissal are that DCH has failed to allege that the Solicitation is literally false and that DCH's allegations of unspecified oral statements are conclusory. Direct also argues that DCH has

---

**11.** Section 1125(a)(1) provides, in pertinent part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any work, term, name, symbol, or device, or any combination thereof, or any false designation of origin, any false or misleading description or any false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

\* \* \* \* \* \*

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

not pleaded sufficient facts on the other elements of Lanham Act false advertising or false designation of origin claims.

Turning first to Direct's alleged oral statements, DCH does not allege the time, place or the content of these statements, and fails to identify the speakers or recipients of the statements. All these details are necessary to the ultimate legal determination of the viability of DCH's Lanham Act claim based on these communications. Thus, the Amended Complaint's general allegations that Direct made false or misleading oral statements are not sufficient to support DCH's Lanham Act claim. The Court nevertheless must construe the Amended Complaint in the light most favorable to DCH and may dismiss the claim only if it appears "beyond doubt" that DCH cannot state a legally viable cause of action under the Lanham Act. The notice pleading requirements of the Federal Rules of Civil Procedure allow for a short, plain statement of the plaintiff's claim. *See* Fed.R.Civ.P. 8(a).[12] Given the number of tenants, the nature of the oral statements, and the fact that Direct presented a motion to dismiss, the Court concludes that it is premature to make a conclusive determination about whether DCH has stated a Lanham Act claim concerning the alleged oral statements by Direct's agents. This issue should be addressed by means of a summary judgment motion or at trial. Ultimately, the oral statements need to be evaluated in context with the written material, under the legal standards for DCH's Lanham Act theories, set forth below.

■ The Court will separately address the viability of the Lanham Act claim that DCH asserts on the basis of the written Solicitation. The parties apparently agree that DCH's Lanham Act claim encompasses potentially two Lanham Act theories:

false advertising (typically asserted under 15 U.S.C. § 1125(a)(1)(B)) and false designation of origin (generally pursued under 15 U.S.C. § 1125(a)(1)(A)). The Court examines each theory in turn. In the Fifth Circuit, the elements of a false advertising claim under the Lanham Act are:

(1) the defendant made a false statement of fact about its product in a commercial advertisement;

(2) the statement actually deceived or had a tendency to deceive a substantial segment of its audience;

(3) the deception was likely to influence the purchasing decision;

(4) the defendant caused the false statement to enter interstate commerce; and

(5) the plaintiff has been or is likely to be injured as a result.

*Logan v. Burgers Ozark Country Cured Hams Inc.,* 263 F.3d 447, 462 (5th Cir. 2001) (referring to § 1125(a)(1)(A)); *Pizza Hut, Inc. v. Papa John's Int'l, Inc.,* 227 F.3d 489, 495 (5th Cir.2000) (construing § 1125(a)(1)(B)); *King v. Ames,* 179 F.3d 370, 373–74 (5th Cir.1999) (referring to § 1125(a)(1)(A)).

■ The allegations in the Amended Complaint as to the Solicitation are legally sufficient to the extent DCH pleads a false advertising claim under § 1125(a)(1) involving a misleading statement that is not literally false. Direct's first argument that the Solicitation contains no literally false statements does not warrant dismissal of the entire false advertising claim. The Solicitation does not need to be "literally false" to be actionable under the Lanham Act in a false advertising case. Misleading statements may be actionable if consumers are actually deceived. "Representations

**12.** The parties have not cited authority to support the application of Fed.R.Civ.P. 9(b) to a Lanham Act Claim.

are not shielded from condemnation under [the Lanham Act] simply because they are literally true. The Act's proscriptions against false representation reaches 'innuendo, indirect intimations, and ambiguous suggestions evidenced by the consuming public's misapprehension of the hard facts underlining an advertisement ... as well as blatant falsehoods.' " *Better Business Bureau v. Medical Directors, Inc.*, 681 F.2d 397, 400 (5th Cir.1982) (quoting *Vidal Sassoon, Inc. v. Bristol–Myers Co.*, 661 F.2d 272, 277 (2d Cir.1981)); *accord William H. Morris Co. v. Group W., Inc.*, 66 F.3d 255, 257–58 (9th Cir.1995).[13]

■ In this case, nothing in the Solicitation is literally false. Read in its entirety, the Solicitation discloses that it is Direct that seeks the information, to update its own files, and DCH is not mentioned. The Solicitation refers only to the publication of the *Dallas/Houston Design To The Trade* directory, not the 2002 DCH Directory. Thus, there is no literally false advertising or false designation of origin claim arising from the Solicitation and, to that extent, Direct's Motion to Dismiss has merit. However, as to a false advertising claim based on "misleading" statements, the Motion is unfounded. DCH has alleged facts addressing all the elements of a claim for misleading advertising, when the Amended Complaint and its attachment, a sample copy of the Solicitation, are construed in the light most favorable to DCH. Direct has alleged the Solicitation was a misleading advertisement. It is feasible that a tenant (*i.e.*, a consumer within the meaning of the Lanham Act) could have been confused by the Solicitation as to its sponsorship in 2001, when the Solicitation was sent, because the Solicitation did not mention that Direct was not at that time authorized to publish a Building directory on behalf of DCH, contrary to the two preceding years. DCH also makes allegations on all other false advertising claim elements. There are allegations that the tenants purchased advertising in the Design Directory because they believed it was the same as the prior years' publication. DCH makes allegations about its financial injury and the nexus to interstate commerce. The Amended Complaint, when read with reference to the Publishing Agreement that is attached, alleges that tenants listed in the DCH Directories may also purchase paid advertisements in the publication and thus the Directory generates revenue to the publisher and affects interstate commerce. *See, e.g.*, Amended Complaint, at 6–7; Publishing Agreement, at 1, 2, 4.[14] The Court concludes that these allegations are sufficient, and cannot conclude as a matter of law that DCH is unable to establish any set of facts that would constitute a viable false advertising claim.[15]

---

**13.** "[W]hen the statements of fact at issue are shown to be literally false, the plaintiff need not introduce evidence on the issue of the impact the statements had on consumers.... In such a circumstance, the court will assume that the statements actually misled consumers.... On the other hand, if the statements at issue are either ambiguous or true but misleading, the plaintiff must present evidence of actual deception." *Pizza Hut*, 227 F.3d at 497 (citations omitted); *see also Seven–Up Co. v. Coca–Cola Co.*, 86 F.3d 1379, 1387 (5th Cir.1996) ("[A] plaintiff must demonstrate that a commercial advertisement or promotion is either literally false or that the

advertisement is likely to mislead and confuse consumers.").

**14.** Indeed, the allegations are consistent with the evidence at the preliminary injunction hearing.

**15.** The fact that liability may be established, however, does not mean that DCH can show substantial damages in this case. The Court retains extensive equitable authority to permit only damages that would be fair under all the attendant circumstances. *See* 15 U.S.C. § 1117.

■ Analysis of the elements of a false designation of origin claim when the statements in issue are misleading but not literally false is less straightforward because of a dearth of Fifth Circuit authority. The Circuit has not specifically addressed a false designation of origin claim. In *King v. Ames*, 179 F.3d 370, (5th Cir.1999), which involved allegedly false representations on the back cover of compact discs, the Fifth Circuit discussed a "false statement" claim that the plaintiff asserted under § 1125(a)(1)(A). The Court referenced false advertising, a claim typically pleaded under § 1125(a)(1)(B), but set forth the elements for a § 1125(a)(1)(A) claim.[16] The Court of Appeals recited the familiar five elements: "(1) the defendants made false statements of fact about [the product in issue]; (2) those statements deceived, or had the potential to deceive, a substantial segment of potential customers; (3) the deception was material, in that it tended to influence purchasing decisions; (4) defendants caused their products to enter interstate commerce; and (5) the claimant has been or is likely to be injured as a result." 179 F.3d at 373–74. These elements track the Fifth Circuit's required proof for a false advertising case. *See, e.g., Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir.2000). It is unclear if the Fifth Circuit's citation to subsection (A) of § 1125(a)(1) is an indication that a false designation of origin theory asserted under that subsection would require the same five elements or not.

The parties do not address any Fifth Circuit authority. Instead, they both cite a district court case, *1st National Reserve, L.C. v. Vaughan*, 931 F.Supp. 463, 466 n. 4 (E.D.Tex.1996), that adopts a formulation of the claim articulated by the Seventh Circuit. *Vaughan* was decided before the Fifth Circuit's detailed rulings about the elements of § 1125(a)(1) Lanham Act claims. The *Vaughan* court held that the elements of a false designation of origin claim are:

(1) the defendant used in connection with trade a false designation of origin or false description or representation;

(2) the defendant caused such goods and services to enter into commerce; and

(3) the plaintiff is a person who believes that he or she is likely to be damaged as a result.

*Vaughan*, 931 F.Supp. at 466 n. 4 (citing *Web Printing Controls Co., Inc. v. Oxy–Dry Corp.*, 906 F.2d 1202, 1204 (7th Cir. 1990)). *Accord Kennedy v. Nat'l Juvenile Detention Ass'n*, 187 F.3d 690, 695–96 (7th Cir.1999).[17]

■ The Court declines at this time to adopt another circuit's formulation of the elements of false designation of origin claims, although the Seventh Circuit's simplified analysis appears sound. Rather, in an exercise of caution, the Court will rely on the elements of a § 1125(a)(1)(A) claim as articulated in *King v. Ames*, which con-

---

**16.** The Court of Appeals did the same thing in *Logan v. Burgers Ozark Country Cured Hams Inc.*, 263 F.3d 447, 462 (5th Cir.2001).

**17.** The Sixth Circuit uses a similar, although not identical, test. In the Sixth Circuit, a Lanham Act claim for false designation of origin contains two elements: (1) the false designation must have a substantial economic effect on interstate commerce; and (2) the false designation must create a likelihood of confusion. *Murray Hill Publications, Inc. v. ABC Communications, Inc.*, 264 F.3d 622, 634 (6th Cir.2001); *Chain, L.P. v. Tropodyne Corp.*, 225 F.3d 659, 2000 WL 712379, *3 (6th Cir. 2000) (unpublished) (citing *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir.1998)). The Sixth Circuit has held that a "description of origin will be considered false if it creates a likelihood of confusion in the consuming public." *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir.1998).

sists of five elements that parallel those in a false advertising case, for a false designation of origin claim asserted under that statute.[18] For the purpose of the pending motion, but without prejudice to reconsideration on summary judgment, the Court deems the elements for a false designation of origin claim based on "misleading" (as opposed to literally false) statements to require proof as follows:

(1) the defendant made a misleading statement of fact about its product's origin;

(2) the statement actually deceived a substantial segment of its audience;

(3) the deception was material, in that it tended to influence purchasing decisions;

(4) the defendant caused the false statement to enter interstate commerce; and

(5) the plaintiff has been or is likely to be injured as a result.

The Court concludes that Plaintiff DCH has met its pleading burden under this formulation of the test. Final resolution of the precise scope of the elements of the false designation of origin claim in this case will be made at a later point in this case, after the parties have addressed pertinent legal authorities and the available proof in greater detail.[19]

Therefore, the Court concludes that Direct's Motion to Dismiss the Lanham Act claim is denied in all respects except as to DCH's theory of the Solicitation's literal falsity, which theory is insufficient as a matter of law and is dismissed.

### C. *Breach of Contract Claim*

DCH alleges that Direct breached the parties' Termination Agreement by publishing, and soliciting tenants for, the Design Directory.[20] The Termination Agreement provides that:

[Direct] will not publish the ***Decorative Center Houston 2002 and Decorative Center Houston 2003 directories*** and/or will not solicit tenants of the Decorative Center of Houston for advertising for

---

**18.** This ruling imposes a higher hurdle than the Seventh and other circuits appear to require for false designation of origin claims. However, this approach imposes no prejudice on plaintiff DCH in light of the conclusions the Court reaches under the potentially higher standard it imposes for the purposes of this Motion.

**19.** The Court does not interpret DCH to be asserting a claim invoking the "passing off" doctrine, which typically arises in the trade dress context. "The Lanham Act prohibits passing off goods or services as those of a competitor by employing substantially similar trade dress which is likely to confuse consumers as to the sources of the product. *Blue Bell Bio–Medical v. Cin–Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir.1989). In this circuit, there are two elements of a trade dress infringement claim. First, the trade dress of a product may be protected as an unregistered trademark if it is nonfunctional, distinctive, and has acquired a secondary meaning. Second, a finding of infringement requires a con-

sideration of the likelihood of confusion. *Taco Cabana International, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1117–18 (5th Cir.1991), aff'd, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)." *Engineering Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1349 (5th Cir.1994). Nevertheless, analogy to this doctrine may suggest that the Fifth Circuit would embrace the simpler elements used by the Seventh Circuit in a false designation of origin claim.

**20.** The elements in a suit for breach of contract are:

(1) the existence of a valid contract;
(2) the plaintiff performed or tendered performance;
(3) the defendant breached the contract.
(4) the plaintiff was damaged as a result of the breach.

*Scott v. Sebree*, 986 S.W.2d 364, 372 (Tex. App.—Austin 1999, pet. denied); *Hussong v. Schwan's Sales Enter., Inc.*, 896 S.W.2d 320 (Tex.App.—Houston [1st Dist.] 1995 no writ).

the *Decorative Center Houston 2002 and Decorative Center Houston 2003 directories.*

Termination Agreement, ¶ 2 (emphasis added). Direct argues that DCH has failed to show any breach of the express terms of the Termination Agreement. Direct contends that it was only restricted by the Termination Agreement from publishing and soliciting advertisements for two specific publications: the "Decorative Center Houston 2002 Directory" and the "Decorative Center Houston 2003 Directory." Direct asserts that it did not publish any documents or directories entitled "Decorative Center Houston 2002" or "Decorative Center Houston 2003." Direct acknowledges that it published, and solicited tenants and advertisements for, a different tenant directory that covered tenants in Building, the *Dallas/Houston Design to the Trade* (the Design Directory), but that this publication was not covered by the terms of the Termination Agreement.

In support of its contract claim, DCH argues for a different interpretation of the Termination Agreement. DCH contends that the lower case "d" used in the words "directories" in paragraph 1 of the Termination Agreement (quoted above) was intended to mean that Direct would not publish *any* directory of DCH's tenants. DCH argues that had the parties intended to limit the restriction to just the specific publication called "Decorative Center Houston 2002," the parties would have used the upper case "d," as appears elsewhere in the parties' Publishing and Termination Agreements. Thus, DCH contends that Direct violated the Termination Agreement by publishing the Design Directory with the DCH tenants included.[21]

In the alternative, DCH argues that parol evidence should be admitted because the Termination Agreement is ambiguous.

 In Texas,[22] a court must determine as a matter of law whether or not a contract is ambiguous. *H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co.*, 150 F.3d 526, 529 (5th Cir.1998); *Nat'l Union Fire Ins. Co. v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex.1995). The Court also must interpret the terms of an unambiguous contract as a matter of law. *MCI Telecommunications Corp. v. Texas Utilities Electric Co.*, 995 S.W.2d 647, 650 (Tex. 1999). The terms of a contract are ambiguous if they are subject to two or more reasonable interpretations. *Balandran v. Safeco Ins. Co.*, 972 S.W.2d 738, 741 (Tex. 1998). On the other hand, if the terms of the contract can be given a definite or certain legal meaning, then the contract is not ambiguous. *H.E. Butt*, 150 F.3d at 529; *CBI*, 907 S.W.2d at 520.

 In making these rulings as to a written contract, the interpretation is to be rendered from the face of the contract document. *CBI Industries*, 907 S.W.2d at 520. The Court may not consider parol evidence for the purpose of creating an ambiguity. *Id.* However, the Court may examine evidence of the circumstances that existed at the time of execution to determine whether an ambiguity exists. *Exxon Corp. v. West Tex. Gathering Co.*, 868 S.W.2d 299, 302 (Tex.1993) (citing *Coker v. Coker*, 650 S.W.2d 391, 393–94 (Tex. 1983)).

 The Court's review of the Termination Agreement in its entirety leads to the conclusion that it is ambiguous as a matter of law. For this determination, the Court has considered only the document

---

21. There is no dispute that Direct had the right to publish its own directory of tenants in the "Dallas Market Center," a Dallas building comparable to the Design Center of Houston.

See Publishing Agreement, at 6, ¶ 23 (handwritten interlineation).

22. The Termination Agreement provides (in ¶ 5) that it shall be governed by Texas law.

itself.[23] In a "whereas clause" of the Termination Agreement, the titles of the parties' anticipated joint publications for 2000, 2001, 2002 and 2003, respectively, were described as the "Decorative Center Houston 2000 Directory," "Decorative Center Houston 2001 Directory," etc., which were defined in the Termination Agreement collectively as the "Publications." The parties then employed the shorter phrase "Decorative Center Houston 2002 and Decorative Center Houston 2003 directories" in paragraph 1, the provision cancelling the Publishing Agreement. From a review of the Termination Agreement itself, it is impossible to tell if the phrase in issue ("Decorative Center Houston 2002 and Decorative Center Houston 2003 directories") was merely a short-hand plural reference to the two specific publications the parties originally planned for the years 2002 and 2003 (*i.e.*, the "Decorative Center Houston 2002 Directory" and the "Decorative Center Houston 2003 Directory," respectively (as Direct argues)), *or* if the phrase referred to generic directories of the Building tenants that Direct might publish in 2002 and 2003 (as DCH contends). This ambiguity most likely will need to be addressed at trial.

### D. *Tortious Interference with Prospective Business Relations*

DCH also asserts a claim for tortious interference with prospective business relations under Texas law (the "TIPBR claim"). DCH alleges here that Direct has "knowingly, intentionally, and maliciously interfered with DCH's prospective business relations with each of its 131 tenants and/or their manufacturers in the Building, including interference with each tenant's advertising in DCH's own Building trade directory for the years 2002, 2003, and forward." Amended Complaint, at 11.[24] DCH in its Amended Complaint added the allegation that, but for Direct's tortious conduct, "there is a reasonable probability that the Plaintiff and each of its 131 tenants would have entered into a contractual relationship for each tenant's advertising in Plaintiff's own Building Directory." *Id.* Direct's Motion to Dismiss addresses Plaintiff's original formulation of this claim, contending that DCH had failed to allege facts on all the necessary elements.

In Texas, the elements of a TIPBR claim are: "(1) a reasonable probability that the plaintiff would have entered into a business relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference." *Baty v. Protech Ins. Agency*, 63 S.W.3d 841, 860 (Tex. App.—Houston [14th Dist.] 2001, pet. filed); *Ash v. Hack Branch Distrib. Co.*, 54 S.W.3d 401, 414–15 (Tex.App.—Waco 2001, pet. denied).[25]

---

**23.** Direct cites the Court to earlier drafts of and other evidence of negotiations about the language of the Termination Agreement. Direct points to evidence that DCH sought a comprehensive restriction on Direct's ability to publish any directory that included DCH tenants, and that Direct rejected this restriction during negotiations. *See* Exhibit 1 to Direct's Brief (an unauthenticated document Direct characterizes as a "draft" of the Termination Agreement).

**24.** This claim also was alleged in Plaintiff's original Complaint. *See* Plaintiff's Complaint, at 14.

**25.** At least one other Texas court has phrased the test differently, using the following elements: "(1) a reasonable probability that the parties would have entered into a contractual relationship, (2) an intentional and malicious act by the defendant that prevented the relationship from occurring, with the purpose of

Direct contends, with reference to DCH's original Complaint that DCH has not adequately pleaded that it had a reasonable probability of entering into advertising business relationships with its tenants. Direct also contends that DCH has failed to plead that Direct was not justified in contacting tenants of DCH for advertising in a market source book unrelated to the DCH tenancy.

Direct's Motion to Dismiss on these grounds is denied. The Court has permitted the filing of the Amended Complaint and thus will address Direct's arguments in light of the allegations in the amended pleading, construing the allegations most favorably to DCH. Direct has not shown as a matter of law that DCH can allege no set of facts upon which it can sustain its TIPBR claim. First, the applicable standard for the likelihood of a contract is "reasonable probability," not reasonable certainty, as Direct's argument implies. As to prospective advertising contracts, DCH has alleged the existence of prospective business relationships between itself and its tenants in that the tenants allegedly were likely to purchase advertisements in the 2002 DCH Directory. The language of the Publishing Agreement (attached to the Amended Complaint) supports this inference; the parties in that agreement express their intent that advertising revenue will be the source of profits for the publisher of the DCH Directory.[26] As the new publisher of that directory, DCH alleges facts sufficient to cover the contention that it suffered damages from anticipated lost advertising revenue in its own directory because many Building tenants, having agreed to pay for advertisements in the Design Directory, elected not to spend more money on another advertisement in a similar publication.[27]

Direct next argues that DCH's TIPBR claim is defective because DCH failed to allege that Direct acted without justification. This argument implicitly addresses the TIPBR element that "the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially certain to occur as a result of the conduct." Justification is generally a defense that a defendant may assert in response to certain tort claims. To the extent that Direct insists that DCH plead that Direct lacked justification for its conduct, the argument is rejected. There is no requirement that a complaint plead an affirmative defense. The Texas Supreme Court recently stated that "[j]ustification and privilege are not useful concepts in assessing interference with prospective relations." *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726–27 (Tex.2001).

Direct's contention that DCH has failed to plead facts in support of the intent or knowledge element of the TIPBR claim fails for another reason. The Amended Complaint includes an allegation that Direct interfered "knowingly, intentionally and maliciously" with DCH's prospective advertising business. DCH's allegations

---

harming the plaintiff, (3) the defendant lacked privilege or justification to do the act, and (4) actual harm or damage resulted from the defendant's interference." *Exxon Corp. v. Allsup*, 808 S.W.2d 648, 659 (Tex.App.—Corpus Christi 1991, writ denied); *Small Business Assistance Corp. v. Clear Channel Broadcasting, Inc.*, 210 F.3d 278, 280–281 n. 1 (5th Cir.2000). Neither party relied upon this formulation of the elements of the TIPBR claim.

26. Also, the Court will not ignore the evidence already of record in this case from the preliminary injunction hearing that many tenants had purchased advertising in the Building directory in years past (*i.e.*, in the 2000 and 2001 DCH Directories).

27. It is noted that this is not a fraud or mistake claim and the Fed.R.Civ.P. 9(b) pleading with particularity requirements do not apply.

thus encompass the required intent of "conscious desire to prevent the relationship from occurring or [knowledge that] the interference was certain or substantially certain to occur as a result of the conduct." In the Federal Rules of Civil Procedure, "[malice, intent, knowledge, and other condition of mind of a person may be averred generally]." FED.R.CIV.P. 9(b). While DCH's allegation is somewhat conclusory, it is sufficient for present purposes.

Direct's argument, however, broaches a more troublesome issue that the parties must address at some point in this case: whether DCH can demonstrate that Direct committed "an independently tortious or unlawful act that prevented the relationship from occurring." When the Amended Complaint is read as a whole, DCH proffers the theory that Direct misled the tenants by suggesting by the wording of the Solicitation that Direct was authorized by DCH and was readying for 2002 the same publication as it issued in the prior two years. To the extent that DCH intends to rely on its state law unfair competition claim as the independent tort or unlawful act necessary for the TIPBR claim, this reliance may be misplaced.[28] An unfair competition claim itself contains the element that there be an underlying tort or illegal act. *See* next section *infra.* It appears circular to permit the TIPBR claim to meet its independent tort requirement by relying on another tort that also requires an independent tort, if the second claim merely relies on the TIPBR claim to meet the comparable element. A potential alternative is that DCH intends to use the alleged violation of the Lanham Act (a statutory claim) as the independent unlawful act. The viability of this theory has not been addressed by the parties and the Court will not reach it at this time. This question should be briefed by the parties, if necessary, on summary judgment or as otherwise appropriate.

The Court therefore concludes, in compliance with the policy that motions to dismiss are disfavored and should rarely be granted, that DCH's TIPBR claim has been sufficiently pleaded and may proceed. However, in order for the parties to more precisely join issue and to ready this case for further proceedings, DCH must file a supplement to its Amended Complaint within five (5) business days of entry of this Memorandum and Order to clarify the precise theory of its TIPBR claim.

### E. *Unfair Competition*

In the Amended Complaint, DCH alleges a new cause of action. DCH now contends that Direct engaged in unfair competition under Texas common law because Direct appropriated DCH's advertising business by allegedly making false and misleading statements through the Solicitation and through oral communications addressed to DCH's tenants. *See* Amended Complaint, at 12–13. Direct did not address this new claim in its motion or briefing.[29] Nevertheless, the parties will need to join issue on it during this case, and thus the Court sets forth the legal questions the claim raises.[30]

---

**28.** DCH has abandoned its common law fraud and tortious interference with contract claims alleged in the original Complaint. Thus, these claims cannot serve as the independent tort for the TIPBR claim.

**29.** Although that claim was added in DCH proposed Amended Complaint, which was submitted after Direct filed its Motion to Dismiss, Direct did file a Reply to its Motion to

Dismiss. In that document, Direct opposed the proposed amendment on the grounds that the Lanham Act claim still was inadequately pleaded and that the amendment was untimely.

**30.** The Court was required to consider this matter to determine if, as a matter of law, the claim was futile. *See* FED.R.CIV.P. 15; *Wimm,* 3 F.3d at 139.

In Texas, a claim for unfair competition "is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." *Taylor Publishing Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000) (quoting *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir.1974)); *accord United States Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 217 (Tex.App.—Waco 1993, writ denied). "The tort [of unfair competition] requires that the plaintiff show an illegal act by the defendant which interfered with the plaintiff's ability to conduct its business." *Taylor Publishing*, 216 F.3d at 486 (citing *Schoellkopf v. Pledger*, 778 S.W.2d 897, 904–05 (Tex.App.—Dallas 1989, writ denied)). "Although the illegal act need not necessarily violate criminal law, it must at least be an independent tort." *Id.*

It is unclear what "illegal act" DCH now intends to serve as the underpinning for its unfair competition claim. It cannot be ascertained from the Amended Complaint, whether DCH intends to rely on its TIPBR claim as the independent tort, or will rely on some other allegedly "illegal act."[31] As discussed in the foregoing section of this Memorandum and Order, the TIPBR claim similarly requires the existence of an "independently tortious or unlawful act." Thus, it is circular to permit DCH to rely for its "illegal act" on the alleged TIPBR claim. The Court concludes that the TIPBR claim cannot serve as the "illegal act" for the unfair competition claim.

The Court does not reach the issue of whether the Lanham Act claim could satisfy the "illegal act" requirement of an unfair competition claim. Whether this precise theory is viable has not directly been addressed by the Fifth Circuit.[32] DCH must file a supplement to its Amended Complaint to clarify within five (5) business days of entry of this Memorandum and Order the precise theory of its unfair competition claim.

---

**31.** As noted earlier, DCH's common law fraud and tortious interference with contract claims are no longer in this case and cannot serve as the independent tort for the unfair competition claim.

**32.** The Fifth Circuit has stated that the defendant must have taken action that is "at least ... an independent tort." It is not clear that a statutory violation satisfies this requirement. It is noted, however, that the Court of Appeals has used very broad general language to describe the tort of unfair competition: "[U]nder Texas law[, unfair competition] 'is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters.'" *Taylor*, 216 F.3d at 486. Similarly, some Texas courts have acknowledged that a statutory violation could serve the illegal act. *See Schoellkopf v. Pledger*, 778 S.W.2d 897, 904–05 (Tex.App.—Dallas, 1989) (citing *Feather-stone v. Indep. Serv. Station Ass'n*, 10 S.W.2d 124, 128 (Tex.Civ.App.—Dallas, 1928, no writ), and n. 10) (citations omitted). Furthermore, there is some precedent for an unfair competition claim to apply to situations in which a plaintiff alleges false advertising and false designation of origin claims:

> In Texas, unfair competition has been defined as "consist[ing of] the simulation by one person, for the purpose of deceiving the public, of the names, symbols, labels or devices employed by a business rival in order to induce [the] purchasing public to buy his products in the belief that they are those of his rival."

*Houston Mercantile Exchange Corp. v. Dailey Petroleum Services Corp.*, 1993 WL 322901, *4 (Tex.App.—Houston [14th Dist.] Aug.26, 1993) (unpublished) (quoting *Avnet v. Texas Centennial Central Exposition*, 96 S.W.2d 685, 687 (Tex.Civ.App.—Dallas 1936, writ dism'd w.o.j.)).

## IV. DCH'S MOTION FOR EXTENSION OF TIME

■ DCH also has filed a motion to extend the time for it to designate expert witnesses in this case.[33] Specifically, DCH wants an extension of the deadline for designation until May 31, 2002, to designate its experts and until thirty days after the close of discovery to provide reports from these individuals.[34] On May 29, 2002, DCH filed a Designation of Experts [Doc. # 33] that listed Robert D. O'Conor as its expert on attorneys' fees, and Richard Nelson Bean, Ph.D., an economist at the University of Houston, an expert on damages calculations.[35] Direct opposes this motion, contending that DCH has been dilatory in various respects in this case and that its reasons for not having designated the experts in a timely manner are without merit. The Court has considered the parties' arguments in light of the posture of this case. The Court finds that no meaningful prejudice to Direct will result from DCH's late designation of experts, and the Court exercises its discretion to permit the designation DCH has filed.

DCH gives as its reasons for late designation the inability to obtain a deposition of Direct and the refusal of Direct to respond fully to all of DCH's interrogatories. While DCH's explanations may be somewhat overstated, the Court agrees that a deposition of Direct is necessary before a plaintiff's expert on damages is in a position to prepare a meaningful report with conclusions to which he should be bound. Nothing in the record reveals dilatoriness by Plaintiff DCH of such a degree that the sanction of barring its experts under present circumstances is appropriate. Moreover, the discovery sought by DCH in the unanswered interrogatories (which relate to Direct's communications with the DCH tenants) are potentially relevant to the advertising revenues Direct received for both the years 2000 and 2001.[36] Thus, any report that Bean already should have given would need substantial supplementation. Matters potentially relevant to a claim or defense are discoverable under Federal Rule of Civil Procedure 26(b)(1). The requested information from prior years under the Publishing Agreement is relevant as one measure of DCH's potential loss of advertising revenues, an available damage theory in a Lanham Act case.

Finally, extension of the experts designation deadline to some degree is not unfounded in light of Direct's delay in filing its motion to dismiss. While that motion was not untimely, the parties only recently joined issue on the elements and scope of the claims in issue.

Accordingly, the Court grants DCH's motion to extend the experts designation date until **May 31, 2002,** and accepts the designation of Messrs. O'Conor and Bean as timely. The Court will permit these experts to submit final reports within 21 days after Direct supplies the answers to interrogatories as requested by DCH, and Direct's representative sits for deposition. The interrogatories shall be answered on or before **June 28, 2002.** The deposition of Direct's representative shall take place in

---

33. *See* Doc. # 25, to which Direct has responded [Doc. # 29]. The parties also have filed a reply [Doc. # 31] and sur-reply [Doc. # 32].

34. *See* Motion, at 1; Reply, at 1.

35. DCH filed with its Designation of Experts a brief report by Mr. Conor.

36. This requested discovery is also potentially relevant to Direct's methods of obtaining advertising for the DCH Directory for 2000 and 2001, and may thus inform damages calculations.

New York City, no later than **July 31, 2002.**

If, in light of this ruling, Direct seeks to reset its own experts designation deadline, the parties shall work out an agreeable schedule. The revised schedule may encompass any an all dates that the parties believe must be altered to accommodate the discovery ordered herein. The Court will extend the discovery deadline in this case up to and including **September 13, 2002,** at the parties' joint request. The motions deadline, joint pretrial order deadline, and docket call may be adjusted by agreement of the parties to reflect these rulings.[37] **The parties will cooperate with each other in setting new docket control deadlines. No further extensions will be granted after the new docket control schedule is established.** Finally, the parties must mediate this case within seventy days.

## V. *CONCLUSION*

The Court, in the interests of justice, grants DCH's Motion for Leave to Amend. Direct's Motion to Dismiss is denied in all respects, except as to the theory of literal falsity in regard to the Solicitation. DCH must file a supplement to its Amended Complaint clarifying its state tort claims as directed herein. DCH's Motion for Extension of Time is granted as provided herein. A new docket control order must be established and the parties shall participate in good faith in a mediation within seventy days of entry of this order. It is hereby

**ORDERED** that Motion of Defendant Direct Response Publications, Inc. to Dismiss Plaintiff's Claims [Doc. # 22] is **DENIED in substantial part,** as set forth in this Memorandum and Order, but DCH must file a supplement to its Amended Complaint as directed herein. It is further

**ORDERED** that Cross–Motion of Plaintiff The Decorative Center of Houston, L.P. to File an Amended Complaint [Doc. # 26] is **GRANTED.** It is further

**ORDERED** that Motion of Plaintiff the Decorative Center of Houston, L.P. to Extend Time to Designate Expert Witnesses [Doc. # 25] is **GRANTED as provided herein.** It is further

**ORDERED** that the parties shall submit within ten (10) business days a proposed new docket control order in accordance with the rulings in this Memorandum and Order. The parties shall select a mediator and shall participate in good faith in a mediation within seventy (70) days of entry of this Memorandum and Order.

---

37. Docket Calls are set the last Friday of each month at 4:00 p.m. in Courtroom 9–F, and are to be set no sooner than three full months after the motions deadline.