**DP WAGNER MANUFACTURING INC., Plaintiff,**

v.

**PRO PATCH SYSTEMS, INC. and Marshalltown Company a/k/a Marshalltown Trowel Company, Defendants.**

Civil Action No. H–04–4610.

United States District Court,
S.D. Texas,
Houston Division.

April 21, 2006.

Eleanor Sanborn Tyler, Locke Liddell et al, Houston, TX, for Plaintiff.

John C. Filosa, Baker & McKenzie, Chicago, IL, David A Brakebill, Elias Mark, Baker & McKenzie, Houston, TX, for Defendants.

Robert J. McAughan, Jr., Locke Liddell and Sapp, Houston, TX, David I. Roche, Baker & McKenzie LLP, Chicago, IL.

## MEMORANDUM AND ORDER

WERLEIN, District Judge.

Pending is Plaintiff DP Wagner Manufacturing Inc.'s Motion for Partial Summary Judgment (Document No. 27). After carefully considering the motion, response, reply and the applicable law, the Court concludes as follows:

### I. Background

Plaintiff DP Wagner Manufacturing Inc. ("DP Wagner") asserts against Defendant Pro Patch Systems, Inc. ("Pro Patch") claims of false marking under the Patent Act, unfair competition, and antitrust violations. DP Wagner and Pro Patch have been competing suppliers of metal wall patch products since the early 1990s.[1] Around that time, Pro Patch began selling a wall patch product comprised of a perforated aluminum plate and a single layer of fiberglass mesh (the "Perforated Plate Patch"). Pro Patch later began offering a wall patch product comprised of a sheet of expandable aluminum mesh and a single layer of fiberglass mesh (the "Expandable Mesh Patch").[2] In 1999, Pro Patch began packaging its products with a wax paper "release liner," which listed the numbers of the following four United States patents (collectively, the "relevant patents"):

- **U.S. Patent No. 4,135,017 (the "'017 patent").** On January 12, 1977, Pro Patch's president Dennis Hoffman ("Mr.Hoffman") applied for a patent generally directed to the broad concept of a metal wall patch. Mr. Hoffman ultimately restricted his application to a laminate wall patch comprised of a "thin and relatively rigid non-combustible plate of aluminum sheeting" coated with adhesive material. This patent issued on January 16, 1979 and expired on December 12, 1997. *See* Document No. 27 ex. C.

- **U.S. Patent No. 4,707391 (the "'391 patent").** In 1987, Mr. Hoffman applied for and obtained a patent directed to a "vehicle body surface repair patch suitable for use in conjunction with a vehicle body surface repair compound" and comprised of "a thin, relatively rigid, flexible and deformable plate which is sufficiently bendable for matching

---

1. The products at issue are metal patches for repairing holes in drywall walls and other hollow interior surfaces. According to DP Wagner, "[t]he patches generally are composed of a layer of metal for strength and a layer of fiberglass mesh to hold spackle material around the metal. Adhesive is applied to the back of the patch, so that it can be stuck on a wall to cover a hole—leaving the user's hands free to apply spackle. Because of their strength and ease of use, requiring no special- ized tools or training, the use of metal, self-adhesive wall repair patches is the dominant method for repairing holes in drywall." Document No. 27 at 2–3.

2. Pro Patch sells a third patch, comprised of an aluminum sheet with round holes and two sheets of mesh, that is not at issue in DP Wagner's motion for summary judgment. Document No. 31 at 5.

the contours of the vehicle body surface to be repaired." *Id.* ex. D.

· **U.S. Patent No. 5,298,099 (the "'099 patent").** In 1989, Mr. Hoffman applied for and obtained a patent directed to a "method of using a deformable and contourable metallic mesh together with a curable repair compound to repair a hole in a surface." *Id.* ex. F.

· **U.S. Patent No. 5,620,768 (the "'768 patent").** In 1993, Mr. Hoffman filed and obtained a patent directed to a three layer patch product consisting of an outer layer of fiberglass mesh, a middle reinforcing sheet, and an inner layer of fiberglass mesh coated with adhesive material. *Id.* ex. G.

*Id.* ex. L. In addition, Pro Patch announced to its customers that it had "decided to mark all manufactured patches with [its] patent numbers" and asked its customers to "put the following language on your packaging: **U.S. Pat # 4,707,391, # 5,620,768, # 5,298,099 and foreign patents.**" *Id.* ex. H (emphasis in original).

According to DP Wagner, "contrary to what Pro Patch led its customers, the public, and competitors and potential competitors to believe, the patents corresponding to the patent numbers that Pro Patch placed on [the release liner sold with] its products and instructed its customers to place on the[ir] packaging for such products, *did not* have any applicability to the products sold by Pro Patch." Document No. 27 at 10. DP Wagner further contends that "[a] t the time of this improper marking Pro Patch not only *lacked a good faith basis* to believe that the marked patents applied to its products, *it knew* that the patents corresponding to the markings it was placing on its products did not have claims covering such products." *Id.* DP Wagner therefore moves for partial summary judgment in its favor on its false marking claim under the Patent Act, arguing that the evidence conclusively establishes that Pro Patch falsely marked its metal wall patch products with patent numbers that do not apply to those products in violation of 35 U.S.C. § 292.

## II. *Summary Judgment Standard of Review*

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R.CIV.P. 56(c). The moving party must "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. *Id.* "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Id.*

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "If the record, viewed in this light, could not lead a

rational trier of fact to find" for the non-movant, then summary judgment is proper. *Kelley v. Price–Macemon, Inc.,* 992 F.2d 1408, 1413 (5th Cir.1993) (citing *Matsushita,* 106 S.Ct. at 1351). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." *Id.* Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." *Anderson,* 106 S.Ct. at 2513.

### III. *Discussion*

██ The Patent Act prohibits falsely marking unpatented items with a patent number:

> Whoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word 'patent' and/or any word or number importing that the same is patented for the purposes of deceiving the public ... shall be fined not more than $500 for every such offense.

35 U.S.C. § 292. To prevail on a claim under this statute, the plaintiff must establish that: (1) an article was marked with the word "patent" or any word or number that imports that the article is patented; (2) the article so marked was an "unpatented article"; and (3) the marking was "for the purposes of deceiving the public." *See id.; Clontech Labs., Inc. v. Invitrogen Corp.,* 406 F.3d 1347, 1352 (Fed.Cir.2005).

According to DP Wagner, the summary judgment evidence establishes that, "since at least 1999,"

> (1) "Pro Patch has marked upon and affixed to all of its metal wall patch products both the word 'patent' and numbers importing the same to be patented";
>
> (2) Pro Patch's Perforated Plate and Expanded Mesh metal wall patch products are "unpatented articles" within the meaning of § 292 because

> (a) neither product is a three-layered patch covered by the '768 Patent,
>
> (b) neither product is a vehicle body surface repair patch covered by the '391 Patent,
>
> (c) the Perforated Plate Patch is not an expandable mesh plate covered by the '099 Patent, and
>
> (d) neither product is covered by the '017 Patent, which had expired; and
>
> (3) "the clear and indisputable inapplicability of the patents at issue to the products marked by Pro Patch is such that there could be no reasonable belief that the marked patents covered the marked products," and Mr. Hoffman in fact held no such belief.

Document No. 27 at 11–15. DP Wagner further contends that Mr. Hoffman "admitted in his deposition that he was aware of the fact that the patents that Pro Patch was applying to its Perforated Plate and Expandable Mesh products could not and did not apply to the products to which such patent markings were applied." *Id.* at 15. Thus, DP Wagner argues, the summary judgment record conclusively establishes that each of the statutory requirements for imposing false marking liability on Pro Patch has been met.

In response, Pro Patch concedes that its products were marked with the relevant patents but argues that it did not violate § 292 because (1) all of its products are covered by at least one of the relevant patents and are therefore not "unpatented" articles, and (2) Pro Patch lacked the requisite intent to deceive.

### A. *The "Unpatented Article" Requirement*

The Federal Circuit recently defined the term "unpatented article" as follows:

> When the statute refers to an "unpatented article" the statute means that the

article in question is not covered by at least one claim of each patent with which the article is marked.

*Clontech,* 406 F.3d at 1352. Because Pro Patch's products are not covered by *each* of the patents with which they are marked, DP Wagner argues, the products are "unpatented articles" within the meaning of § 292.

 Pro Patch does not deny that its products are not covered by all of the patents with which they are marked. Pro Patch does not dispute, for example, that the '017 patent is expired; that its Expanded Mesh Patch is not covered by the '768 patent; and that its Perforated Plate Patch is not covered by either the '099 patent or the '768 patent.[3] Instead, Pro Patch disputes the meaning and applicabil-

ity of the *Clontech* decision, arguing that (1) "the main point for which Wagner cites *Clontech* (i.e. that an unpatented article is one that is not covered by all marked patents) was merely dicta and is directly at odds with the actual result in the case"; and (2) "even if *Clontech* did re-define what is meant by 'unpatented article' in [§ ] 292, the case represents a significant change in the law that is not applicable to the marking in this case." Document No. 31 at 12.

First, Pro Patch argues that the definition of "unpatented article" set forth in *Clontech* is merely dicta, which the *Clontech* court itself did not actually follow. *Id.* at 14–161. In *Clontech*, the patent holder, Invitrogen Corporation ("Invitrogen"), marked certain of its molecular

---

3. Pro Patch does argue, however, that its products are properly marked with the '017 patent, asserting that "[i]t is not a violation of [§ 292] for a patent holder to continue to mark with an expired but previously applicable patent." Document No. 31 at 18. In support of this proposition, Pro Patch cites two cases, neither of which holds that marking a product with an expired patent can never constitute a violation of § 292. *See Arcadia Mach. & Tool Inc. v. Sturm, Ruger & Co., Inc.,* 786 F.2d 1124, 1125 (Fed.Cir.1986) (upholding district court's grant of summary judgment in favor of patent holder who had marked his products with an expired patent, stating that "[p]aramount is the [district] court's finding and conclusion that Arcadia had totally failed, after at least nine months of discovery, to produce any evidence of intent to deceive the public."); *FMC Corp. v. Control Solutions, Inc.,* 369 F.Supp.2d 539, 584 (E.D.Pa.2005) (holding that copyright infringement defendant failed to prove the affirmative defense of unclean hands, which was based on the patent holder's marking of its product with an expired patent, because there was no evidence that the patent holder had acted with the requisite intent to deceive). It is self evident that once a patent has expired it provides no protection for the article that it described. It necessarily follows that an article when marked with an expired patent number nonetheless remains an "unpatented

article" within the meaning of § 292. *See Chisum on Patents,* § 20.03[7][c][vii], at 20–657 ("There is little authority on whether continued use of a patent number on an article after expiration of the patent constitutes culpable mismarking. The patent marking statute (35 U.S.C. Section 287) requires marking only with the patent number. Because the issue date is not given, the expiration date cannot readily be determined. Therefore, a strong case can be made for finding culpable mismarking when a person intentionally continues to mark articles with the number of an expired patent.").

Pro Patch also argues that all of its products are covered by the '391 patent. *See* Document No. 31 at 16–17. DP Wagner replies that "[g]iven the controlling nature of *Clontech,*" which requires that the product in question be covered by *each* patent with which it is marked, "the Court need not address Pro Patch's tenuous argument that its vehicle body repair patent [i.e., the '391 patent] covered the wall patch products." Document No. 33 at 4. It appears that fact issues may exist on whether Pro Patch had a reasonable belief that its products fell within the scope of the '391 patent. However, this will not preclude DP Wagner from obtaining a partial summary judgment that Pro Patch falsely marked certain of its products with the '017, '768, and '099 patents.

biology products—namely, its RNase H deficient Reverse Transcriptase ("RT") polypetides known as SUPERSCRIPT ("SS") and SUPERSCRIPT II ("SSII"); its kits for preparing DNA molecules using RTs; and its cDNA libraries—with one or more of four U.S. patents—the '797 patent, the '776 patent, the '005 patent, and the '608 patent (the "relevant patents"). *Clontech,* 406 F.3d at 1349–50.[4] Clontech Laboratories, Inc. ("Clontech") sued Invitrogen, claiming that the kits, SS, SSII, and cDNA libraries were not covered by the relevant patents and were therefore falsely marked.

After a bench trial, the district court agreed. Specifically, the district court determined that none of the relevant patents was directed to Invitrogen's cDNA libraries;[5] that the kits and SUPERSCRIPT products failed to meet the "substantially reduced RNase H activity" limitation, as defined in the relevant patents; that Invitrogen was on notice, by virtue of the results from experiments it conducted in 2000, that the kits, SS, and SSII did not meet the "substantially reduced RNase H activity" limitation and were therefore not covered by the relevant patents; and that Invitrogen's failure to correct its mistaken mismarking of its products in light of the results of the 2000 experiments rose to the level of deceptive conduct. *Id.* at 1350–51. The trial court therefore held Invitrogen liable for falsely marking its products in violation of § 292.

On appeal, the Federal Circuit found that the district court misinterpreted the results of the 2000 experiments. *Id.* at 1353–55. According to the Federal Circuit, the evidence before the district court was that the 2000 tests, when properly interpreted, showed that in 13 of the 14 experiments performed, RNase activity was no different in the presence of SS or SSII than it was in the absence of RTs. *Id.* at 1354. The Federal Circuit therefore reversed the district court's "determination that the data generated by the 2000 experiments constituted notice to Invitrogen that the marking of SS and SSII was statutorily deceptive based exclusively on the limitation 'substantially no RNase H activity.'" *Id.* at 1355. In other words, the Federal Circuit held that Clontech did not prove by a preponderance of the evidence that Invitrogen had no reasonable belief that its products were properly marked with the patents containing the "substantially no RNase H activity" limitation. The Federal Circuit was careful to note, however, that it was "not reviewing and offer[ed] no opinion on whether Invitrogen's SS and SSII RTs me[t] the limitations of any of the claims in any of the patents." *Id.* at 1358.

With respect to the '608 patent, Invitrogen argued that "even if it knew that SS and SSII could not meet the 'substantially no RNase activity' limitation, it cannot be liable for false marking with the '608 patent because the claims of the '608 patent define the limiting levels of RNase H activity using different language." *Id.* at 1353. Because the district court gave no indication that it interpreted this similar

---

4. According to the district court, each of the relevant patents was directed to "a gene which encodes reverse transcriptase having DNA polymerase activity and substantially no RNase H activity." *See Clontech Labs., Inc. v. Invitrogen Corp.,* 263 F.Supp.2d 780, 785 ¶¶ 17, 20–22 (D.Del.2003). According to the Federal Circuit, however, the '608 patent "contains a number of claims that define the amount of RNase H activity of the claimed

RTs using language similar to, but different from, 'substantially no RNase activity,'" such as "substantially reduced RNase H activity," "no detectable RNase H activity," and "does not significantly degrade an mRNA template." *See Clontech,* 406 F.3d at 1355.

5. This portion of the district court's decision was not challenged on appeal.

(but not identical) claim language, the Federal Circuit could not review whether the evidence supported a finding that Invitrogen had knowledge that SS and SSII failed to meet the claim limitations of the '608 patent. *Id.* at 1355, 1358–59. Accordingly, the Federal Circuit vacated the district court's determination that the SS and SSII were falsely marked with the '608 patent and remanded that issue to the district court. *Id.*

According to Pro Patch, the Federal Circuit's decision to remand the false marking claim with respect to the '608 patent reveals that the Federal Circuit did not mean what it said when it stated that an "unpatented article" is a product not covered by at least one claim of *each* patent with which the article is marked. *See* Document No. 31 at 15. Pro Patch contends that "[t] he 2000 test that Invitrogen ran did show that at least some of the patents (i.e. the ones calling for 'no activity') did not apply to the SS and SSII enzymes." *Id.* Thus, Pro Patch argues, "since the set of Invitrogen patents marked on the enzymes and kits included some narrow (and thus inapplicable) patents [*i.e.*, those with the 'substantially no RNase activity' limitation] the Federal Circuit should have, assuming Wagner's view of the *Clontech* decision, affirmed the district court's ruling under the 'new' definition of 'unpatented article.'" *Id.* Instead, Pro Patch argues, "because *some* of the patent claims of one of the Invitrogen patents [*i.e.*, the '608 patent] *might* have been broad enough to cover the enzymes in question, the court remanded the case back to the district court." *Id.* Thus, Pro Patch argues, the *Clontech* decision makes clear that a product need only be covered by at least one of the patents with which it is marked.

Pro Patch misconstrues the *Clontech* decision. The Federal Circuit did not, as Pro Patch contends, find that the 2000 tests clearly established that SS and SSII were covered by the '797, '776, and '005 patents; to the contrary, the Federal Circuit specifically declined to decide whether SS and SSII were covered by any of the patents. What the Federal Circuit held is that even if SS and SSII were not covered by the '797, '776, and '005 patents, such that SS and SSII were mismarked, Clontech failed to prove by a preponderance of the evidence that the mismarkings were made with the requisite intent to deceive, given that the 2000 experiments did not put Invitrogen on notice that SS and SSII failed to meet the "substantially no RNase activity" limitation. In other words, because Clontech failed to prove the third element of a false marking claim—that the marking was "for the purposes of deceiving the public"—Clontech did not prove that SS and SSII were falsely marked with the '797, '776, and '005 patents.

■ Furthermore, the Federal Circuit's decision to remand the '608 patent claim does not, as Pro Patch contends, demonstrate that a product need only be covered by one of the patents with which it is marked. As explained above, the Federal Circuit determined that Clontech failed to prove that SS and SSII were falsely marked with the '797, '776, and '005 patents. Thus, if as Pro Patch contends, Invitrogen need only have believed that SS and SSII fell within the scope of at least one of the relevant patents, then there would have been no reason for the Federal Circuit to remand the issue of whether Invitrogen had knowledge that SS and SSII did not meet the limitations of the '608 patent. In other words, although the Federal Circuit had already determined that Clontech failed to prove that SS and SSII were falsely marked with the '797, '776, and '005 patents, the Federal Circuit nonetheless asked the district court to consider whether SS and SSII were falsely

marked with the '608 patent. Thus, contrary to Pro Patch's contention, the remand establishes that courts must consider whether a product is falsely marked with each patent.

■ According to Pro Patch, however, even if an "unpatented article" is an article not covered by each patent with which it is marked, this definition represents a significant change in the law that is not applicable to the markings in this case. Pro Patch contends that before May 5, 2005, the date of the *Clontech* decision, "courts were generally in agreement that the term 'unpatented article' must be strictly construed as referring to a product not covered by any claim of a patent included in the marking." Document No. 31 at 13–14 (citing *Ansul Co. v. Uniroyal, Inc.,* 306 F.Supp. 541, 565–66 (S.D.N.Y.1969)) ("It has been stipulated by the parties that Uniroyal placed on labels of its MH products the numbers of four patents, two of which, the 917 and 926, are inapplicable.... In fact, all of the Uniroyal MH products ... were covered with respect to their use by Claim 7 of the 916 patent, one of the patents listed on the label. They were not, therefore, 'unpatented products,' and the statute, by its terms is not applicable.") (internal citations and footnotes omitted), *reversed in part on other grounds,* 448 F.2d 872 (2d Cir.1971), *cert. denied,* 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1972); 7 Donald S. Chisum, *Chisum on Patents,* § 20.03[7][c][vii], at 20–656 (2002) ("Section 292 requires as an element of patent mismarking that the marked article be 'unpatented.' The courts apply this element literally. Thus, they hold that, regardless of intent, there is no culpable mismarking if the marker lists a number of patents and fewer than all the patents cover the article.") (citing *Santa Anita Mfg. Corp. v. Lugash,* 369 F.2d 964 (9th Cir.1966); *Ansul,* 306 F.Supp. at 565–66).[6] Because "[a]ll of the marking about which Wagner complains in this case occurred before the Federal Circuit's decision in *Clontech,*" Pro Patch argues, *Clontech's* definition should not be applied in this case. Document No. 31 at 12, 16.

Pro Patch's argument is not persuasive. It is undisputed that the law as interpreted by the Federal Circuit governs this case. *See Holmes Group, Inc. v. Vornado Air Circulation Sys.,* 535 U.S. 826, 122 S.Ct. 1889, 1892–93, 153 L.Ed.2d 13 (2002); *Midwest Indus., Inc. v. Karavan Trailers, Inc.,* 175 F.3d 1356, 1359 (Fed.Cir.1999). In *Clontech,* the Federal Circuit expressly stated that the term "unpatented article" "means that the article in question is not covered by at least one claim of *each* patent with which the article is marked," *see Clontech,* 406 F.3d at 1352 (emphasis added), and the Federal Circuit's construction is controlling in this case, notwithstanding the fact that other courts may have interpreted the term differently in the past.

In sum, because it is undisputed that Pro Patch's products are not covered by at least one claim of *each* of the patents with

---

**6.** Pro Patch also cites *Noma Lites Canada, Ltd. v. Westinghouse Elec. Corp.,* 399 F.Supp. 243, 254 (D.D.C.1975), as stating, "With this principle in mind, this court concludes—as at least one other court has done—that the statute only prohibits the marking of articles that are not subject to either foreign or domestic patent protection." *See* Document No. 31 at 13. *Noma Lites* contains no such statement. The statement is made in *Kor–CT, LLC v. Savvier, Inc.,* 344 F.Supp.2d 847, 857 (D.Conn.2004), but at issue in that case was whether a product covered only by a foreign patent was an "unpatented article," in which case the patent holder's description of its product as "patented" was a mismarking. *Kor–CT* is therefore inapposite to the issue before this Court—*i.e.,* whether a product marked with multiple patent numbers, some of which are not applicable, is an "unpatented" article.

which they are marked, the products are "unpatented articles" within the meaning of § 292.

B. *Intent to Deceive*

■ Pro Patch also contends that its president, Mr. Hoffman, "did not intend to deceive anyone, and there is at least a question of fact regarding Mr. Hoffman's state of mind, and whether at the time he marked the products, he had an intent to deceive the public." Document No. 31 at 12. In *Clontech*, the Federal Circuit explained the intent to deceive requirement as follows:

> Intent to deceive is a state of mind arising when a party acts with sufficient knowledge that what it is saying is not so and consequently that the recipient of its saying will be misled into thinking that the statement is true. *Seven Cases v. United States*, 239 U.S. 510, 517–18, 36 S.Ct. at 190, 193, 60 L.Ed. 411 (1970). Intent to deceive, while subjective in nature, is established in law by objective criteria. *Id.* Thus, "objective standards" control and "the fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant drawing the inference that there was a fraudulent intent." *See Norton v. Curtiss*, 57 C.C.P.A. 1384, 433 F.2d 779, 795–96 (1970). Thus, under such circumstances, the mere assertion by a party that it did not intend to deceive will not suffice to escape statutory liability. Such an assertion, standing alone, is worthless as proof of no intent to deceive where there is knowledge of falsehood. But in order to establish knowledge of falsity the plaintiff must show by a preponderance of the evidence that the party accused of false marking did not have a reasonable belief that the articles were properly marked (i.e., covered by a patent). Absent such proof of lack of reasonable belief, no liability under the statute ensues.

*Clontech*, 406 F.3d at 1352–53; *see also Brose v. Sears, Roebuck & Co.*, 455 F.2d 763, 769 n. 8 ("The statute does not extend to one who has an honest, though mistaken, belief that upon a proper construction of the patent it covers the article in question."). In other words, the intent to deceive requirement is satisfied with evidence that the patent holder marked a product with a patent without a good faith belief that the patent included a claim that covered the product.

■ DP Wagner argues that the summary judgment evidence conclusively establishes that Pro Patch mismarked its products with the requisite intent to deceive because the *"undisputed record* shows that Pro Patch engaged in the marking of its products with *full knowledge* that the patent numbers were being applied to its products where the patents at issue did not include any claims that covered the marked products." Document No. 33 at 5. DP Wagner points out that Mr. Hoffman admitted in his deposition that the '768 patent, which covers a three-layer patch with two mesh layers, does not apply to Pro Patch's two-layer Perforated Plate Patch or Expandable Mesh Patch products; that the '099 patent, which covers a patch made of expandable metallic mesh, does not apply to Pro Patch's Perforated Plate Patch products, which consist of a perforated aluminum plate and a single layer of fiberglass mesh; and that he knew that the release liner listing all four of the relevant patents was going to be used on everything Pro Patch manufactured. *See* Document No. 27 ex. E at 75, 78–79, 102–03, 109–10. DP Wagner also notes that Mr. Hoffman does not contend that he had a good faith belief that Pro Patch's two-layer products were covered by the three-layer '768 patent with which they were marked; that its perforated plate products were covered by the expandable mesh '099 patent with which

they were marked; or that the '017 patent had not yet expired. Thus, DP Wagner argues, the uncontroverted summary judgment evidence establishes "the fact of misrepresentation [*i.e.*, that the Expandable Mesh Patch products are covered by the '017 and '768 patents, and that the Perforated Plate Patch products are covered by the '017, '768, and '099 patents] coupled with proof that the party making it [Mr. Hoffman] had knowledge of its falsity." *See* Document No. 27 at 5–7.

■ In response, Mr. Hoffman declares that he "made the decision to apply [the relevant patents] to the release liner" in an effort to "differentiate [his] product from potential copiers"; that his "only objective in marking [his] products was to provide a unique identification that would not upset his private label customers by revealing the manufacturer of the product and would allow [him] to tell [his] products from other suppliers[']"; that he "did not intend to deceive the public in marking [his] release liner"; that, "based on communication with [his] patent counsel, he understood that if [he] had made or was planning to offer products that [he] felt were the subject of [his] patents, [he] should include those numbers"; that "[s]ince the release liner was used with all of [his] products, [he] included four of [his] patents, i.e., [the relevant patents]" on it; and that "[i]t would be a significant logistical problem and impossible from a practical standpoint to have different release liners for different patches." *See* Document No. 31 ex. 1 ¶¶ 18–21, 24–30. In other words, Mr. Hoffman essentially avers that he did not act with the requisite intent because his primary purpose in marking the products with the relevant patent numbers was to "differentiate [Pro Patch's] various products from knock-offs without putting his company's name on the private labeled products," not to deceive the public. Document No. 31 at 11. Mere denial of intent, however, does not legally suffice to create

a fact issue regarding good faith. *See Clontech*, 406 F.3d at 1352–53 ("[T]he mere assertion by a party that it did not intend to deceive will not suffice to escape statutory liability. Such an assertion, standing alone, is worthless as proof of no intent to deceive where there is knowledge of falsehood.").

Likewise, to the extent Mr. Hoffman alleges that he had a good faith belief that it was not a violation of the law, as he understood it, to place on his products patent numbers that he knew to be inapplicable to those products, this contention fails to give rise to a genuine issue of material fact on the question of Pro Patch's intent. *Id.* at 1353 n. 2 ("Invitrogen has a third argument, which it contends is a blanket defense to all charges of false marking. The argument is based on the district court's findings that employees 'unfamiliar with the patent laws' honestly believed the products to be correctly marked. This of course is preposterous. . . . [T]he inference of intent to deceive cannot be defeated with blind assertions of good faith where the patentee has knowledge of mismarking."). Thus, the uncontroverted summary judgment evidence conclusively establishes "the fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity," and Pro Patch has failed to present any evidence that would defeat the resulting inference of fraudulent intent. DP Wagner is therefore entitled to summary judgment on its false marking claim.

In sum, DP Wagner has established that Pro Patch falsely marked its Perforated Plate Patch products with the '017, '768, and '099 patents, and falsely marked its Expandable Mesh Patch products with the '017 and '768 patents, in violation of § 292. Summary judgment must therefore be granted in favor of DP Wagner on its false marking claim with respect to those pat-

ents. DP Wagner has not, however, established as a matter of law that Pro Patch falsely marked its products with the '391 claim, and DP Wagner' s motion for summary judgment will be denied with respect to that patent.

### IV. *Order*

Based on the foregoing, it is

ORDERED that Plaintiff DP Wagner Manufacturing Inc.'s Motion for Partial Summary Judgment (Document No. 27) is GRANTED IN PART, and Defendant Pro Patch Systems, Inc. is adjudged to have violated 35 U.S.C. § 292 by falsely marking its Perforated Plate Patch products with the '017, '768, and '099 patents and by falsely marking its Expandable Mesh Patch products with the '017 and '768 patents. The motion is otherwise DENIED.

The Clerk shall notify all parties and provide them with a true copy of this Order.

### *MEMORANDUM AND ORDER AND NEW TRIAL DOCKET CALL DATE*

The background for this suit and identities of the parties may be found in the Court's Memorandum and Order entered April 21, 2006. Now pending are the following: Defendant Pro Patch Systems, Inc.'s Motion in Limine on DP Wagner's Lanham Act and Common Law Unfair Competition Claims or, in the Alternative, Motion to Certify Interlocutory Appeal and Stay Proceedings (Document No. 51), Motion in Limine to Bifurcate (Document No. 52), Motion in Limine (Document No. 53),[1] and Motion in Limine for Subsequent Trial, if Necessary, on Exemplary or Punitive Damages (Document No. 63); and Plaintiff DP Wagner Manufacturing Inc.'s Motion in Limine to Exclude Pro Patch's Witnesses Pursuant to Rule 37 (Document No. 55) and Motion in Limine (Document No. 56). After having carefully considered the motions, responses, reply, and the applicable law, the Court concludes as follows:

A. *Pro Patch's Motion in Limine on DP Wagner' s Lanham Act and Common Law Unfair Competition Claims or, in the Alternative, Motion to Certify Interlocutory Appeal and Stay Proceedings*

1. *Preemption*

Pro Patch argues that because DP Wagner' s Lanham Act and Texas law claims of false advertising and unfair competition are premised on the same facts upon which DP Wagner's Patent Act claim is premised—*i.e.*, false marking—those claims are preempted by the Patent Act. Alternatively, Pro Patch argues that because statements made regarding one's patent rights are conditionally privileged under the patent law, one cannot be held liable for false statements under the Lanham Act unless such statements are made in bad faith. Because DP Wagner has neither alleged nor presented any affirmative evidence of bad faith, Pro Patch argues, the Lanham Act claim fails as a matter of law.

---

1. During the May Docket Call, the Court denied in part Pro Patch's Motion in Limine (Document No. 53) with respect to Pro Patch's personal jurisdiction defense, which the Court determined to have been waived. *See PaineWebber Inc. v. Chase Manhattan Private Bank (Switz.)*, 260 F.3d 453, 460 (5th Cir.2001) ("[A] party may waive any jurisdictional objections if its conduct does 'not reflect a continuing objection to the power of the court to act over the defendant's person.' "); *Schwartz v. M/V Gulf Supplier*, 116 F.Supp.2d 831, 835 (S.D.Tex.2000) (holding that defendant waived personal jurisdiction defense by waiting nine months to bring a motion to dismiss, during which time it engaged in a considerable amount of pretrial activity). The Court carried the motion with respect to the remaining arguments, which the Court addresses here.

DP Wagner responds that (1) the motion is an untimely attempt to seek dispositive relief, and Pro Patch has not shown good cause to amend the scheduling order to permit the belated motion; (2) the affirmative defense of preemption was not pleaded in Pro Patch's answer; and (3) the Patent Act does not preempt DP Wagner's claims under the Lanham Act and Texas law.

■ Although this motion in limine does seek dispositive relief well after the dispositive motion deadline, both the motion and DP Wagner's response raise questions of law that may be more efficiently decided before trial rather than at the close of Plaintiff's evidence or after all the evidence is closed in what the parties have estimated will be a two- to three-day trial. *See Eischeid v. Dover Constr.*, 217 F.R.D. 448, 454–56 (N.D.Iowa 2003) (finding that "good cause" within the meaning of R. 16(b) existed for extending the dispositive motion deadline where belated summary judgment motion raised legal issues that the court "must inevitably address, either prior to or in the course of trial" and where the proffered dispositive motion "might present the most efficient method for addressing the legal issues presented").

■ Preemption by federal patent law is an affirmative defense. *See, e.g., Univ. of Colo. Foundation, Inc. v. Am. Cyanamid Co.*, 196 F.3d 1366, 1370 (Fed. Cir.1999) ("As affirmative defenses, Cyanamid asserted that the doctrines of preemption by federal patent law, laches, and limitations under relevant statutes barred the University's claims."). Regional circuit law governs the question of waiver of a defense. *Ultra–Precision Mfg., Ltd. v. Ford Motor Co.*, 411 F.3d 1369, 1376 (Fed. Cir.2005). In the Fifth Circuit, "[a]lthough failure to raise an affirmative defense under Rule 8(c) in a party's first responsive pleading 'generally results in a waiver ...' [w]here the matter is raised in the trial court in a manner that does not result in unfair surprise ... technical failure to comply precisely with Rule 8(c) is not fatal. Thus, a defendant does not waive an affirmative defense if he 'raised the issue at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond.'" *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 491–92 (5th Cir.2001) (holding that the district court properly allowed the defendant, who asserted the disputed defense as a contested issue of law in the joint pretrial order, to pursue the defense despite the defendant's failure to comply with Rule 8(c)).

The Federal Circuit recently upheld a Michigan district court's determination that a defendant who raised a preemption defense for the first time in a motion in limine had not waived the defense by failing to plead it in the answer. *See Ultra–Precision*, 411 F.3d at 1376–77. Because the district court afforded the plaintiff an opportunity to respond to the preemption argument through both briefing and oral argument, the Federal Circuit concluded that the district court's ruling was in accordance with Sixth Circuit law, which, much like Fifth Circuit law, permits affirmative defenses not asserted in an answer to proceed so long as the plaintiff has the opportunity fully to respond to and brief the issue and is not unfairly prejudiced.

In this case, Pro Patch listed the preemption defense as a contested issue of law in its portion of the Pretrial Order filed on April 28, 2006, and renewed the defense in a motion in limine that was filed on May 4, 2006. DP Wagner promptly filed a response, and the Court heard oral arguments on the issue on May 15, 2006. Thus, although Pro Patch did not assert preemption in its answer, Pro Patch raised the issue in a pragmatically sufficient time and DP Wagner has had opportunity fully to brief and respond to the issue and is not unfairly prejudiced. Accordingly, the

Court will permit the preemption defense to proceed.

The Federal Circuit has not held whether § 292 of the Patent Act preempts state law unfair competition claims, and conflicts with Lanham Act claims, when there is a marking of products with inapplicable patents. At least one district court has concluded that such claims are preempted unless the plaintiff proves that the defendant acted in bad faith. *See Moore N. Am., Inc. v. Poser Business Forms, Inc.,* No. Civ. A. 97–712, 2000 WL 1480992, at *2, 5–7 (D.Del. Sept. 29, 2000) (holding that Lanham Act and state law unfair competition claims premised on false patent marking were not preempted by the Patent Act because the proponent alleged that the mismarking was done in bad faith) (relying on *Hunter Douglas, Inc. v. Harmonic Design, Inc.,* 153 F.3d 1318, 1336 (Fed.Cir. 1998), *rev'd in part on other grounds, Midwest Indus., Inc. v. Karavan Trailers, Inc.,* 175 F.3d 1356, 1359 (Fed.Cir.1999)); *accord Clontech Labs., Inc. v. Invitrogen Corp.,* 263 F.Supp.2d 780, 794–95 (D.Del. 2003), *rev'd in part on other grounds,* 406 F.3d 1347 (Fed.Cir.2005).

In *Hunter Douglas,* the Federal Circuit explained that "federal patent law bars the imposition of liability for publicizing a patent in the marketplace unless the plaintiff can show that the patentholder acted in bad faith." *Hunter Douglas,* 153 F.3d at 1336. "Indeed, Title 35 authorizes patentholders to 'give notice to the public that the [patented article] is patented' and makes marking or specific notice of the patent to the accused infringer a prerequisite to the recovery of dam-

ages," and "such conduct may not be the subject of state tort liability." *Id.* (quoting 35 U.S.C. § 287). "Accordingly, in a case involving a patentholder's conduct in obtaining or publicizing its patent, if the plaintiff were to fail to allege . . . bad faith in the publication of a patent, then the complaint would be dismissed for failure to state a claim upon which relief can be granted because of federal preemption. If the claim were sufficient but the proof were not to show such conduct, then the claim would fail on the merits." *Id.* "Although to state and maintain a claim under a state tort law, a plaintiff may not be required to allege or prove that the patentholder . . . acted in bad faith in the marketplace, to escape preemption, the plaintiff would need to allege and prove ultimately such conduct." *Id.* at 1337. In other words, "to avoid preemption, 'bad faith must be alleged and ultimately proven, even if bad faith is not otherwise an element of the tort claim.'" *Globetrotter Software, Inc. v. Elan Computer Group, Inc.,* 362 F.3d 1367, 1374 (Fed.Cir.2004) (citing *Zenith Elecs. Corp. v. Exzec, Inc.,* 182 F.3d 1340, 1355 (Fed.Cir.1999)). "To require less would impermissibly alter the balance between the competing purposes of federal patent law that Congress has proscribed." *Hunter Douglas,* 153 F.3d at 1337. Likewise, "before a patentee may be held liable under § 43(a) [of the Lanham Act] for marketplace activity in support of its patent, . . . the marketplace activity must have been undertaken in bad faith." *Zenith,* 182 F.3d at 1353. This bad faith requirement "is in addition to the elements required by § 43(a) itself." *Id.* (citations omitted).[2]

---

**2.** The elements of a § 43(a) false advertising claim are: (1) that the defendant has made a false or misleading statement of fact concerning his product or another's; (2) that the statement actually or tends to deceive a substantial portion of the intended audience; (3) that the statement is material in that it is

likely to influence purchasing decisions; (4) that the product traveled in interstate commerce; and (5) that there is likelihood of injury to the plaintiff in terms of declining sales, loss of goodwill, etc. *See Logan v. Burgers Ozark Country Cured Hams, Inc.,* 263 F.3d 447, 462 (5th Cir.2001).

Although *Hunter Douglas, Zenith,* and *Globetrotter* all involved state law tort and/or Lanham Act claims premised on a patentholder's communications asserting infringement of its patent and warning alleged infringers and their customers about potential litigation, the reasoning in those cases appears equally applicable to claims related to over-marking one's products, given that (1) the Patent Act imposes a duty upon patentees to mark their products in order to recover damages for infringement, and (2) a patentholder is not liable under the Patent Act for mismarking its products absent an intent to deceive. To impose state law or Lanham Act liability on a patentholder for less than bad faith mismarking would penalize patentholders for engaging in conduct that the Patent Act does not proscribe and would therefore impermissibly conflict with federal patent law. Thus, to prevail on its Lanham Act and state law unfair competition claims, DP Wagner must prove that Pro Patch's mismarkings were made in bad faith.

Contrary to Pro Patch's assertion, however, DP Wagner has adequately pleaded that Pro Patch's mismarkings were made in bad faith. Although DP Wagner does not use the words "bad faith," DP Wagner does allege that Pro Patch marked its products with inapplicable patents despite knowing that those patents did not cover the marked products. Such conduct, if true, would be evidence of bad faith. *Cf. Zenith,* 182 F.3d at 1354 (stating that while "[e]xactly what constitutes bad faith [is] to be determined on a case by case basis," where a "patentee knows that the patent is invalid, unenforceable, or not infringed, yet represents to the marketplace that a competitor is infringing the patent, a clear case of bad faith representation is made out"). Thus, under the liberal rules of notice pleading, Pro Patch has been sufficiently provided with fair notice of the material points of DP Wagner's claims, including the facts that DP Wagner contends evidence bad faith, and DP Wagner's Lanham Act and unfair competition claims may therefore proceed to trial.

### 2. Certification for Interlocutory Appeal

Alternatively, Pro Patch asks the Court to certify an interlocutory appeal of the ruling on DP Wagner's false marking claim under § 292 of the Patent Act. Piecemeal appeals are generally not favored. Pro Patch does not contend that it will suffer any harm by perfecting its appeal at the conclusion of what the parties agree will be a relatively short two- to three-day trial, nor does Pro Patch advance any other compelling reason for an interlocutory appeal. Accordingly, the request for certification on an interlocutory appeal will be denied.

### B. Pro Patch's Motion in Limine to Bifurcate

Pro Patch requests that the Court bifurcate the trial as follows: (1) a bench trial on the amount to be paid by Pro Patch for the false marking violations; and (2) a jury trial on the issues of liability and damages under DP Wagner's remaining counts. Bifurcation is unnecessary. Upon completion of the jury trial on DP Wagner's remaining claims, the Court will hold a hearing to assess the penalty to be awarded to DP Wagner under § 292 of the Patent Act. If there is evidence that was not relevant to jury trial but has bearing on the § 292 penalty, that evidence may be introduced at the post-jury trial hearing.

### C. Pro Patch's Motion in Limine

#### 1. Unfair Competition Claim

Pro Patch argues that DP Wagner's unfair competition claim fails as a matter of law because (1) unfair competition is a "piggy-back" tort, applying only when the

defendant has committed a related, independent tort, and false marking in violation of the Patent Act is not a tort and does not provide a basis for a claim of unfair competition; and (2) unfair competition is governed by the law of the state wherein the cause of action arises, and here, the facts giving rise to the unfair competition claim (the mismarking) occurred in Illinois, not in Texas. Thus, Pro Patch argues, the unfair competition claim should be dismissed.

■■■■■ "Unfair competition under Texas law 'is the umbrella for all statutory and non-statutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters.' " *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir.2000) (quoting *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir.1974)). The tort requires that the plaintiff show an illegal act by the defendant which interfered with the plaintiff's ability to conduct its business. *Taylor*, 216 F.3d at 486. Although the illegal act need not necessarily violate criminal law, it must at least be an independent tort. *Id.* ("Without some finding of an independent substantive tort or other illegal conduct, we hold that liability cannot be premised on the tort of 'unfair competition.' "). "Thus, unfair competition functions like a 'piggy-back' tort, applying only when the court finds that a related, independent tort has been committed." *Healthpoint, Ltd. v. River's Edge Pharms., LLC*, 2005 WL 356839, at *3 (W.D.Tex. Feb. 14, 2005).

■■■■■ Whether a violation of § 292 of the Patent Act is the sort of illegal conduct that would support an unfair competition claim is an issue that has not been addressed by the courts. The Court need not decide the issue here, however, because DP Wagner has also asserted a false advertising claim under the Lanham Act, which courts agree can support a state law unfair competition claim. *See Laughlin Prod., Inc. v. ETS, Inc.*, 257 F.Supp.2d 863, 871–72 (N.D.Tex.2002); *Healthpoint,* 2005 WL 356839, at *4; *cf. Decorative Ctr. of Houston, LP v. Direct Response Pubs., Inc.*, 208 F.Supp.2d 719, 735, n. 32 (S.D.Tex.2002) (Atlas, J.) (declining to decide whether a Lanham Act violation, or any other statutory violation, could satisfy the illegal act requirement of an unfair competition claim, but noting that the Fifth Circuit has used "very broad general language to describe the tort of unfair competition").

■■■■■ With respect to Pro Patch's second argument, "[u]nfair competition . . . is a tort and is governed by the law of the state wherein the cause of action arises." *Bell v. Starbucks U.S. Brands Corp.*, 389 F.Supp.2d 766, 778 (S.D.Tex.2005) (Kent, J.) (quoting *Jud Plumbing Shop on Wheels, Inc. v. Jud Plumbing & Heating Co.*, 695 S.W.2d 75, 78 (Tex.App.-San Antonio 1985)). Contrary to Pro Patch's contention, however, DP Wagner's unfair competition claim does not arise in the state where the release liner was produced and affixed to the wall patches (*i.e.,* Illinois); rather, the cause of action arose where the effects of the unfair competition were felt (*i.e.,* where the products were sold and hence, where the customer confusion occurred). Because DP Wagner alleges that Pro Patch's products were sold and distributed in Texas, DP Wagner's unfair competition claim arose in Texas and is governed by Texas law.

In sum, Pro Patch has not demonstrated that DP Wagner's unfair competition claim fails as a matter of law, and Pro Patch's motion in limine in this regard will be denied.

### 2. *Construction of the '391 Patent*

Pro Patch's arguments regarding the '391 patent are moot in view of the Court's

claim construction hearing and order that will follow.

### 3. *The Clontech Decision*

Pro Patch requests permission to argue to the jury that the law prior to July 2005 (i.e., the date of the *Clontech* decision) was that the false marking statute applied only to products not covered by at least one of the patents with which they were marked. Short of arguing to the jury that the law was otherwise before *Clontech,* there may be circumstances in which mention of the decision would be relevant, such as in the context of (1) evidence that Pro Patch relied on the advice of legal counsel in marking its products, (2) the effect of *Clontech* in reassessing the legal advice previously given by Pro Patch's counsel, and (3) controverted issues in trial, such as Pro Patch's good faith. Counsel shall first approach the bench before presenting evidence or argument to the jury on what the law was before *Clontech.*

### 4. *Miscellaneous Evidentiary Issues*

Additionally, Pro Patch seeks to preclude any evidence of or reference to the following:

a) the Court's April 21, 2006 memorandum and order;

b) damages arising outside of DP Wagner's customer base;

c) Pro Patch's market share or market power, or Pro Patch's size relative to that of DP Wagner;

d) events that occurred outside the statute of limitations;

e) marking of products done by Pro Patch's customers;

f) pretrial motions or rulings in this case;

g) documents or information requested but not previously disclosed to Pro Patch during discovery; and

h) mediation, settlement offers, negotiations, or the like.

The motion in limine will be granted with respect to items a, f, g, and h, and counsel will approach the bench before referring to these items. The motion is otherwise denied, and the Court will rule on the remaining items if and when objections are made to any such evidence at trial.

### D. *DP Wagner's Motion in Limine to Exclude Defendant's Witnesses Pursuant to Federal Rule of Civil Procedure 37*

According to DP Wagner, Pro Patch lists in its pretrial order three live witnesses who were not previously disclosed to DP Wagner in this case and who have never been deposed by either party. DP Wagner notes that one of the witnesses, Mr. Kicack, was never mentioned in discovery by either party. DP Wagner argues that the nondisclosure of these witnesses violates Federal Rule of Civil Procedure 26, and DP Wagner therefore moves to exclude the witnesses in accordance with Rule 37(c). *See* FED.R.CIV.P. 37(c)(1) (prohibiting the introduction of evidence that, without substantial justification, has not been disclosed as required by Rule 26(a) and (e) unless the failure to disclose is harmless). DP Wagner argues that it would be prejudiced if these witnesses are permitted to testify because it has not deposed these witnesses, would need documentary discovery from these third parties in order adequately to prepare to cross-examine them at trial, and would need to examine the witnesses' knowledge and qualifications to the extent these witnesses are being offered as experts. In sum, DP Wagner argues that the purpose of Rules 26 and 37 is to avoid surprise and prevent trial by ambush, and Pro Patch's behavior is wholly at odds with these rules.

Pro Patch has filed no response to DP Wagner's motion, and, in accordance

with Local Rule 7.4, the motion is deemed unopposed. The motion will therefore be granted, and Pro Patch will not be permitted to call at trial any witness not disclosed to DP Wagner during discovery.

### E. *DP Wagner's Motion in Limine*

DP Wagner also moves to exclude any evidence, statements, or arguments regarding: (1) its voluntary dismissal of its antitrust and tortious interference claims; (2) Paul Wagner's ownership interest in a separate company, Cole and Ashcroft; and (3) evidence that Pro Patch did not produce in discovery, including witnesses that it did not name in disclosures or otherwise make known to DP Wagner during discovery. Pro Patch has not filed a response in opposition to DP Wagner's motion in limine, and it is deemed unopposed under Local Rule 7.4. The motion in limine will be granted with respect to items 1 and 3; the Court will rule on item 2 if and when objection is made to any such evidence at trial.

### F. *Pro Patch's Motion in Limine for a Subsequent Trail, if Necessary, on Exemplary or Punitive Damages*

Pro Patch requests that the Court bifurcate the issue of exemplary or punitive damages. *See* FED. R. CIV. P. 42(b) (providing that a court may bifurcate any claim or separate issue in a trial in order to promote convenience or to avoid prejudice). The motion will be granted.

Accordingly, it is

ORDERED that Pro Patch Systems, Inc.'s Motion in Limine on DP Wagner's Lanham Act and Common Law Unfair Competition Claims or, in the Alternative, and Motion to Certify Interlocutory Appeal and Stay Proceedings (Document No. 51), is DENIED. It is further

ORDERED that Pro Patch's Motion in Limine (Document No. 53) is GRANTED IN PART as set forth above and is other-wise DENIED, and Pro Patch Systems, Inc.'s Motion in Limine to Bifurcate (Document No. 52) is DENIED. It is further

ORDERED Motion in Limine for Subsequent Trial, if Necessary, on Exemplary or Punitive Damages (Document No. 63) is GRANTED. It is further

ORDERED that DP Wagner Manufacturing Inc.'s Motion in Limine to Exclude Pro Patch's Witnesses Pursuant to Rule 37 (Document No. 55) is GRANTED, and DP Wagner's Motion in Limine (Document No. 56) is GRANTED IN PART as set forth above and is otherwise DENIED.

### *New Docket Call Date*

This case is reset for Docket Call on **September 8, 2006, at 4:00 p.m.**

The Clerk will enter this Order and send copies to all counsel of record.